UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-	Case No.: 2:09-cr-59-FtM-29SPC

DETRICK C. SMITH
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on Motion to Suppress Evidence and Memorandum of Law (Doc. #18) filed on November 7, 2009. The Government's Response to the Motion to Suppress Evidence (Doc. # 23) was filed on November 25, 2009. A hearing was conducted before the undersigned on November 30, 2009 and subsequently on December 3, 2009.[1]

At the hearing on November 30, 2009, the Defendant was present and represented by Court appointed counsel, Russell Rosenthal, Assistant Federal Public Defender. The Government was represented by Assistant United States Attorney Jeffrey Michelland. The Government called Officer Erin Campbell of the Fort Myers Police Department (FMPD) as its witness and introduced several exhibits. The Defendant did not call any witnesses but introduced one exhibit. Because Defense Counsel had just recently received several hundred pages of discovery including the records of the K-9 used in the search of the vehicle in questions, he asked for additional time in which to review

---

[1] The Transcript of the November 30, 2009, hearing will be referred to as (Tr. 1, p:l). The Transcript of the December 3, 2009, hearing will be referred to as (Tr. 2, p:l).

them prior to cross examination of the K-9 Officer. The hearing was adjourned until Thursday, December 3, 2009.

At the hearing on December 3, the Defendant was present and represented by Atty. Rosenthal and the Government was represented by AUSA Michelland. The Government called Officer Glen Thompson of the Fort Myers Police Department and introduced a DVR of the scene of the traffic stop, and photographs of the area surrounding the stop. The Government also recalled Officer Erin Campbell. The Defendant called Manual Vasile, an Investigator at the Federal Public Defender's Office, and introduced several photographs as well.

After hearing the testimony of the witnesses , examining the items introduced into evidence, and listening to the arguments of counsel, the Court can now evaluate the Motions before it and rule by Report and Recommendation.

## TESTIMONY AND EVIDENCE

**Officer Erin Campbell**: (Tr. 1, 7 - 92; Tr. 2, 68-76 )

Erin Campbell (Ofc. Campbell) is an officer with the FMPD and at the time of the traffic stop had been in that capacity for approximately two years. (Tr. 1,7:19-25, 50:8-10). On January 19, 2009, at approximately 1:08 a.m., Ofc. Campbell observed a Cadillac leave the Golfview Motel and head northbound on Cleveland Avenue. (Tr. 1, 12:5-16). The Cadillac traveled in the outer right hand lane of Cleveland Avenue. (Tr. 1, 12:17-19). Ofc. Campbell witnessed that Cadillac swerve off the road, cross over the right white line and almost hit the curb. (Tr. 1, 13:1-20, 16:13-15). Both the front and rear tires were over the white line for several seconds. (Tr. 1, 16:16-22). He suspected potentially a drunk driver, but usually gives the driver another chance in case they were looking for a cell phone or something. (Tr. 1, 17:6-11). He continued to follow the Cadillac northbound on

Cleveland. The Cadillac again swerved out of the right lane and across the right white line with both wheels almost striking the curb, for a second time. (Tr. 1, 17:14-22). Just as Ofc. Campbell was deciding to pull the vehicle over, it made a right turn onto Hanson Street heading in an easterly direction. (Tr. 1, 18:8-11). Instead of turning into the proper lane, the Cadillac turned into the left lane designated for oncoming traffic and then corrected itself moving into the proper lane of travel. (Tr. 1, 19:7-12). Ofc. Campbell was approximately three car lengths behind the vehicle when it was turning. (Tr. 1, 25:2-17; 27:11-13, Tr. 2, 69:4-11). The vehicle tires were to the left of the double yellow lines. (Tr.1, 27:11-13).[2] Ofc. Campbell activated his lights and siren to conduct a traffic stop for Failure to Maintain a Single Lane. (Tr. 1, 28:1-16).

Ofc. Campbell approached the vehicle and made contact with the driver whom he identified as Detrick Smith, the Defendant. (Tr. 1, 34:23-24). He noted two other individuals in the vehicle, a male in the front passenger seat, and a female in the back seat. (Tr. 1, 35:2-10). Ofc. Campbell noted that the Defendant's eyes were bloodshot, that he was shaking, and that he was sweating although it was cold outside. (Tr. 1, 38:13-18). Ofc. Campbell also smelled an odor of alcohol on the Defendant's breath when he was speaking to him and noticed that the Defendant's speech was slurred and that he was almost stuttering. (Tr. 1, 49:12-23). [3]

After doing his license and warrants checks, Ofc. Campbell wrote the Defendant's tickets and put them on the trunk of his car. (Tr. 1, 39:24-25). For his safety, that is where he has people sign their citations. It also allows him the opportunity to observe them walking. (Tr. 1, 40:1-5).

---

[2] His two right wheels were just outside of the two yellow lines when he was coming back in. (Tr. 1, 64:24-25). His two left wheels were in the turn lane. (Tr. 1, 65:1-7).

[3] Although Ofc. Campbell testified to these observations, he did not note them in his report. (Tr. 1, 53:10-19).

Everyone was still in the car at that point in time. (Tr. 1 , 40: 6-8). The Defendant was issued citations for failure to maintain a single lane and safety belt violation. (Tr. 1, 41:18-20, 42:6-10).

At that point in time, Ofc. Campbell approached the vehicle and asked the occupants to step out. (Tr. 1, 43:8-9). He asked the Defendant to step out so he could sign the citations and asked the occupants to step out so that the K-9 could do a free air sniff. (Tr. 1, 43:8-14, 78:20-24). The Defendant and his passengers continued to ask questions regarding the stop, the dog, and what was going on. (Tr. 1, 43:24-25, 44:1-2). He had not signed the citation yet. (Tr. 1, 44:3-4). As Ofc. Campbell was answering the questions, the Defendant bent over to tie his shoe which gave the officer the impression that he was about to run. (Tr. 1, 44:6-8). Ofc. Campbell called for another officer. (Tr. 1, 44:9). By this time, the K-9 had alerted on the car. (Tr. 1, 44:10-11). Approximately two minutes passed between the time that the Defendant was brought over to the car and the K-9 alerted on the vehicle. (Tr. 1, 47:11-15). When Ofc. Campbell attempted to cuff the Defendant, he began to fight with him and attempted to run. (Tr. 1, 44:15-18). Ofc. Campbell jumped on him and tackled him to the ground, wrestling with him on the ground. (Tr. 1, 45:6-7). Ofc. May attempted to assist him and Ofc. Thompson attempted to taser the Defendant. (Tr. 1, 45:12-15). The Defendant said he was going to give up but then pushed up off the ground and took off running. (Tr. 1, 45:17-19). Ofc. Thompson released the dog who was able to apprehend the Defendant. (Tr. 1, 46:1-6).

**Officer Glenn Thompson** (Tr. 2, 5 - 67)

Officer Glen Thompson (Ofc. Thompson) is a K-9 officer with the City of Fort Myers Police Department and has been serving in that capacity for almost five years. (Tr. 2, 5:9-13). Prior to that

time, he served as a road patrol officer and prior to that a corrections deputy with the Lee County Sheriff's Office for a year and a half. (Tr. 2, 5:14-19).

Ofc. Thompson was on duty on January 19, 2009, with his canine partner Dusty, a German Shepherd with whom he had been partners for approximately four years. (Tr. 2, 6:2-14). In 2005, he and Dusty went through a 450 hour course in patrol usage: obedience, apprehension work, tracking, building searches, and area searches. Upon completion of the training they certified in patrol through the National Police Canine Association. (Tr. 2, 18-24). In July of 2005, he and Dusty trained for approximately 200 hours in narcotics detection in different environments - vehicles, buildings, and large areas. (Tr. 2, 7:7-14). As a result of the training, they certified with the National Police Canine Association in narcotic detection in both vehicles and buildings for the detection of marijuana, cocaine, crack, base, HCL, methamphetamine, heroin, and MDMA or ecstacy. (Tr. 2, 7:14-17). He and Dusty have been certified every year since 2005. (Tr. 2, 14:15-17). In addition to the certification, FMPD policy and procedures dictate that K-9 officers attend weekly training for anywhere between six and ten hours. (Tr. 2, 15:7-9). Ofc. Thompson supplied copies of his training records, from the time of his original certification with Dusty up through 2009. (Govt. Ex. 6).

During the early morning hours of January 19, 2009, he was patrolling with Dusty. (Tr. 2, 24:8-24). He arrived at the scene at Cleveland and Hanson at 1:08:35 a.m. (Tr. 2, 25:1-2, 28:14-15). His vehicle was equipped with a video camera which recorded his arrival and activity subsequent to his arrival at the stop. (Tr. 2, 26:1-16) (Govt. Ex 5). He exited his vehicle and began to watch the occupants as Ofc. Campbell ran records, warrants, DL checks, et cetera. (Tr. 2, 29:1-2). He was asked during his first contact with Ofc. Campbell to take part in the investigation by doing a free air sniff with his K-9. (Tr. 2, 31:8-13). He did not do the free air sniff right away because he had three

occupants in the vehicle that he was watching and for officer safety. (Tr. 2, 32:2-15). At 1:15:31 a.m. Ofc. Campbell came out of his car with a ticket book in his hand and walked back to the Defendant's vehicle. (Tr. 2, 32, 20-23). At 1:16:05, he asked the front passenger and the rear passenger to step out of the vehicle. (Tr. 2, 33:6-8). At 1:16:32, Ofc. Campbell walked back with the Defendant towards the rear of his vehicle. (Tr. 2, 33:14-15). At 1:17:02, Ofc. Thompson walked back towards his vehicle to retrieve Dusty in order to complete the free air sniff of the vehicle. (Tr. 2, 33:22-25). He and Dusty did a single pass around the vehicle at 1:19:22. (Tr. 2, 35:3-5). When Dusty came to the rear passenger's side door, towards the front of the vehicle, he pulled back to the rear passenger front seam, started bracketing odor, gave a real heavy sniff on the seam and immediately sat down and was rewarded for his final response. (Tr. 2, 35:5-10). Based upon Dusty's training, he was alerting to the fact that a narcotic odor was coming from the vehicle. (Tr. 2, 35:12-14).

As a result of Dusty's alert, Ofc. Thompson started to search the interior passenger compartment of the vehicle. (Tr. 2, 35:24-25). Inside the center console of the vehicle he located a baggy of suspected crack cocaine. (Tr. 2, 36:4-9). He then searched underneath the driver's seat where he located a semi-automatic Skyy handgun inside a nylon pocket holster. (Tr. 2, 37:4-9). [4] He exited the vehicle and got Ofc. Campbell's attention to alert him that the occupants of the vehicle needed to be detained. (Tr. 2, 37: 24-25, 38:1-5).

At that time, Ofc. Campbell attempted to place the Defendant in handcuffs with the assistance of Ofc. Jarred May (Ofc. May). (Tr. 38:13-15). He observed the Defendant resist by

---

[4] The firearm was located under the front part of the seat, closer to the driver with the butt of the firearm or the grip of the pistol facing the front of the vehicle. (Tr. 2, 37:10-19).

flailing his arms and moving his elbows left and right in an attempt to strike both officers. (Tr. 2, 38:16-18). He ran over in an attempt to help the other officers yelling at the Defendant to "Stop resisting" and to "Put your hands behind your back, stop resisting, stop resisting." (Tr. 2, 39: 8-12). The Defendant continued to resist by struggling at which time he performed a contact stun by using his taser on the Defendant's lower back in an attempt to subdue him. (Tr. 2, 39:14-19). The female occupant of the car threw her cell phone and struck him in the forehead which diverted his attention from the Defendant. (Tr. 2, 40:19-22). Ofcs. May and Campbell went to the ground with the Defendant and were wrestling with him. The Defendant was able to partially stand up with both officers on his back, he threw them off, and began to run. (Tr. 2, 41:1-5). He went to his vehicle, retrieved Dusty and ordered the Defendant to stop. The Defendant continued to run at which time he deployed Dusty in an attempt to apprehend the Defendant. (Tr. 2, 41:12-16). Dusty gave pursuit to the next intersection, rounded the corner and at that time, the Defendant swung to make contact with Dusty, at which time, Dusty bit him in the upper thigh area and brought him to the ground. (Tr. 41: 21-25, 42:1-3).

After the Defendant had been apprehended, he went back and completed the search of the vehicle. (Tr. 2, 9-11). He located a prescription pill bottle underneath the front passenger seat which was wrapped up in duct tape and contained crack cocaine. He also located another revolver under the same front passenger's seat. Both firearms had ammunition in them. (Tr. 2, 43:4-12).

**Manual Vasile** (Tr. 2, 77- 102)

Manual Vasile (Inv. Vasile) is an investigator with the Federal Public Defender's Office and has served in that capacity for a little over two years. (Tr. 2, 77:23-25, 78:1-3). Inv. Vasile has been an investigator for approximately fifteen years.[5] (Tr.2, 78:13-15).

Inv. Vasile became involved in the investigation of this case at the direction of the Federal Public Defender's Office. He measured the distance between the Golfview Motel and Hanson Street and US41 to be roughly six-tenths of a mile. (Tr. 2, 78:21-25, 79:1-3). Traveling at the speed limit of 40 miles per hour, it took him approximately a minute and six seconds to travel that distance. (Tr. 2, 79:9-14). He took photographs of the intersection of US 41 and Hanson on November 30, 2009, at approximately 7 or 7:30 p.m., so that they would approximate or simulate the nighttime conditions of the stop. (Tr. 2, 79:19-24). (Def. Ex. C-1, C-2 and C-3). The two photographs that he took that depict the vehicle in the lane in which the Defendant would have been traveling were taken while he was standing on the sidewalk of Cleveland Avenue roughly 10 to 12 yards from the intersection. (Tr. 2, 83:8-11, 86:11-12). Inv. Vasile also testified that if he was traveling in the lane closest to the curb approaching Hanson that he would not have been able to see if a car was in the southbound turn lane of Hanson. (Tr. 2, 84:2-25, 85:1-2). He testified that based upon the angle and basic depth perception that it would have been hard, absent other cues such as another vehicle to determine where the vehicle is or in which of three lanes that exist on Hanson the vehicle is traveling in. (Tr. 2, 88:2-6).

---

[5]Inv. Vasile had prior experience in the Federal Public Defenders Office in the Eastern District of California - Fresno for three years, the Sandy Oak County Public Defender's Office for three years, and was in private practice as an investigator for roughly four years. (Tr. 2, 4-12).

Inv. Vasile also testified to reviewing the records of the K-9 used in this case specifically for the years 2008 and 2009.[6] (Tr. 2, 88:12-24). During that time period, Dusty, the K-9, was used to potentially detect narcotics a total of 89 times. (Tr. 2, 89:21-25). Thirty-two (32) of those times there was no alert and 57 times Dusty actually alerted. (Tr. 2, 89:25, 90:1-6). No narcotics or narcotics paraphernalia were found as a result of 25 of those alerts. (Tr. 2, 90:7-11). However, on 8 of those occasions, an explanation was given by the driver as to why the dog alerted. (Tr. 2, 90:18-25).[7] In calculating the percentages, Inv. Vasile testified that almost 30 percent of the time Dusty alerted, there were no drugs present. (Tr. 2, 91:12-21).

## DISCUSSION

The Defendant moves the Court to suppress all evidence derived from the search of the vehicle. As grounds, the Defendant states: (1) the initial stop of the vehicle was unlawful; (2) the subsequent detention of the Defendant exceeded the scope of a legitimate traffic stop; and (3) there was no probable cause to search the vehicle. The Government counters that the stop was lawful, the detention did not exceed the scope of the stop, and there was sufficient probable cause to search the vehicle.

### *(1) Whether the Initial Stop of the Vehicle was Unlawful*

The Defendant argues the initial stop of the vehicle was invalid because Ofc. Campbell did not have probable cause to make the traffic stop. The Government stated the traffic stop was valid

---

[6]The records reviewed were the actual usage records as opposed to the training records. (Tr. 2, 89:1-4). (Def. Ex. B).

[7]The 8 alerts where Dusty alerted and there were no drugs found but there was an explanation regarding firsthand knowledge as to drugs in the vehicle were not treated as correct alerts. (Tr. 2, 91:9-11).

because Ofc. Campbell had probable cause to believe the Defendant had committed a traffic violation. Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation occurred, and an officer's motive in making the traffic stop does not invalidate what is otherwise "objectively justifiable behavior under the Fourth Amendment," U.S. v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (quoting Whren v. U.S., 517 U.S. 806, 810-812, 116 S. Ct. 1769, 135 L. Ed.2d 89 (1996); U.S. v. Strickland, 902 F. 3d 937, 940 (11th Cir. 1990)( holding that "[a] police officer may stop a vehicle '[w]hen there is . . . probable cause to believe that a driver is violating any one of a multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles."); U.S. v. Roy, 869 F.2d 1427, 1431-1433 (11th Cir. 1989) *cert. denied,* 493 U.S. 818, 110 S. Ct. 72, 107 L. Ed.2d 38 (1989) (holding the subjective belief of Coast Guard did not invalidate boarding, even where the officers themselves believed they did not have probable cause). The Fourth Amendment test for a traffic stop should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation. Whren, 517 U.S. at 810-812. Thus, in order to determine whether or not a specific Fourth Amendment requirement such as probable cause or reasonable suspicion has been met, the court must determine if the officer's actions were reasonable. Ornelas v. U.S., 517 U.S. 690, 696, 116 S. Ct. 1657, 1661-1662 (1996).

Florida Statute § 316.089 - Driving on roadways laned for traffic, provides in pertinent part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply:
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety. . . .
> (5) A violation of this section is a noncriminal traffic infraction, punishable as a moving violation as provided in chapter 318.

Here Ofc. Campbell testified that at approximately 1:08 a.m., he observed a Cadillac leave the Golfview Motel and head northbound on Cleveland Avenue. (Tr. 1, 12:5-16). The Cadillac traveled in the outer right hand lane of Cleveland Avenue. (Tr. 1, 12:17-19). Ofc. Campbell witnessed that Cadillac swerve off the road, cross over the right white line and almost hit the curb. (Tr. 1, 13:1-20, 16:13-15). Both the front and rear tires were over the white line for several seconds. (Tr. 1, 16:16-22). He continued to follow the Cadillac northbound on Cleveland and the Cadillac again swerved out of the right lane and across the right white line with both wheels almost striking the curb, for a second time. (Tr. 1, 17:14-22). When the Cadillac made a right turn onto Hanson Street heading in an easterly direction, instead of turning into the proper lane, the Cadillac turned into the left lane designated for oncoming traffic and then corrected itself moving into the proper lane of travel. (Tr. 1, 18:8-11, 19:7-12). Ofc. Campbell was approximately three car lengths behind the vehicle when it was turning. (Tr. 1, 25:2-17; 27:11-13, Tr. 2, 69:4-11). The vehicle tires were to the left of the double yellow lines. (Tr. 27:11-13).

The Defendant presented testimony from Inv. Vasile to counter Ofc. Campbell's statements. Inv. Vasile took photos of the intersection of Hanson and US 41. (Tr. 2, 79:19-24)(Def. Ex. C-1, C-2 and C-3). The two photographs that he took that depict the vehicle in the lane in which the Defendant would have been traveling were taken while he was standing on the sidewalk of Cleveland Avenue roughly 10 to 12 yards from the intersection. (Tr. 2, 83:8-11, 86:11-12). Inv. Vasile also testified that if he was traveling in the lane closest to the curb approaching Hanson that he would not have been able to see if a car was in the southbound turn lane of Hanson. (Tr. 2, 84:2-25, 85:1-2). He testified that based upon the angle and basic depth perception that it would have

been hard, absent other cues such as another vehicle to determine where the vehicle is or in which of three lanes that exist on Hanson the vehicle is traveling in. (Tr. 2, 88:2-6).

However, Inv. Vasile acknowledged during his testimony that he had no way of knowing that the vehicles in the photos he took were in the same position of the Defendant's Cadillac that night. (Tr. 2, 81:5-9). Further Inv. Vasile was standing on the sidewalk and not in the same location as Ofc. Campbell would have been when he drove behind the Defendant's vehicle that night. Therefore, he could only speculate on what Ofc. Campbell saw that night. Ofc. Campbell also testified that he observed the Defendant's vehicle tires were still to the left of the double yellow lines after he had made his turn onto Hanson. (Tr.1, 27:11-13).[8] Although the Court finds Inv. Vasile to be a credible witness, the Court does not find that his observations from his vantage point negate the observations of Ofc. Campbell on the night of the incident.

It is clear from Ofc. Campbell's testimony that any reasonable officer would have made the same decision to stop the Defendant's Cadillac based on probable cause to believe that a violation of § 316.089 had occurred. As such, it is respectfully recommended that Ofc. Campbell had probable cause to stop the Defendant for a traffic violation under Florida law.

*(2) Whether the Subsequent Detention of the Defendant Exceeded the Scope of the Traffic Stop*

The Defendant claims that he was detained beyond the permissible scope of the traffic stop, arguing that the traffic stop was over by the time K-9 Dusty was deployed and performed a free air sniff of the Cadillac. The Government states the stop was delayed because of the Defendants own actions.

---

[8] His two right wheels were just outside of the two yellow lines when he was coming back in. (Tr. 1, 64:24-25). His two left wheels were in the turn lane. (Tr. 1, 65:1-7).

The Eleventh Circuit has found an unconstitutional delay when a motorist is detained beyond the completion of a license check to wait for the arrival of a drug-detection dog. Holloman, 113 F.3d at 196. However, that is not the case here. A traffic stop is a seizure within the limits of the Fourth Amendment. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing Prouse, 440 U.S. at 653)). Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than to a custodial arrest. Purcell, 236 F.3d at 1277. Therefore, the Court's analysis of a traffic stop is similar to that found in Terry v Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Purcell, 236 F.3d at 1277. "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." Id. (citing Terry, 392 U.S. at 20) (internal quotations omitted)). Furthermore, the duration of the traffic stop is limited to the time necessary to effectuate the purpose of the stop. U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity." Holloman, 113 F.3d at 196. In making its determination regarding the duration and scope of the detention, the Court must consider the totality of the circumstances, "including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." U.S. v. Hardy, 855 F.2d 753, 759 (11th Cir.1988).

In this case, the duration of the detention was short (only about twelve (12) to fifteen (15) minutes) and the intrusiveness of the detention was minimal (no handcuffs, no guns pointed, only conversation on a public roadway with a camera taping the encounter before the dog alert) and consistent with the stop for improper change of lane.

Ofc. Thompson, testified that he and his dog, Dusty, arrived at the scene at Cleveland and Hanson at 1:08:35 a.m. (Tr. 2, 24:8-24, 25:1-2, 28:14-15). Ofc. Thompson testified that he was asked during his first contact with Ofc. Campbell to take part in the investigation by doing a free air sniff with his K-9. (Tr. 2, 31:8-13). However, Ofc. Thompson stated that he did not do the free air sniff right away because he had three occupants in the vehicle that he was watching and for officer safety. (Tr. 2, 32:2-15). He watched the occupants as Ofc. Campbell ran records, warrants, DL checks, *et cetera*. (Tr. 2, 29:1-2). Ofc. Campbell testified that after doing his license and warrants checks, he wrote the Defendant's tickets and put them on the trunk of his car. (Tr. 1, 39:24-25). Ofc. Campbell testified that it was usual practice to have people exit their vehicles and sign the ticket on the trunk of his patrol car for his safety as well as so that he can observe them walking. (Tr. 1, 40:1-5). Everyone was still in the car at that point in time. (Tr. 1, 40: 6-8).

Ofc. Thompson testified that he observed that at approximately 1:15:31 a.m. Ofc. Campbell came out of his car with a ticket book in his hand and walked back to the Defendant's vehicle. (Tr. 2, 32, 20-23). At that point in time, Ofc. Campbell approached the vehicle and asked the occupants to step out. (Tr. 1, 43:8-9). He asked the Defendant to step out so he could sign the citations and asked the occupants to step out so that the K-9 could do a free air sniff. (Tr. 1, 43:8-14, 78:20-24). Ofc. Thompson testified that it was approximately 1:16:05, when he asked the front passenger and the rear passenger to step out of the vehicle. (Tr. 2, 33:6-8). At 1:16:32, Ofc. Campbell walked back with the Defendant towards the rear of his vehicle. (Tr. 2, 33:14-15). At 1:17:02, Ofc. Thompson walked back towards his vehicle to retrieve Dusty in order to complete the free air sniff of the vehicle. (Tr. 2, 33:22-25). He and Dusty did a single pass around the vehicle at 1:19:22. (Tr. 2, 35:3-5).

As Ofc. Campbell issued the Defendant citations for failure to maintain a single lane and safety belt violation, the Defendant and his passengers continued to ask questions regarding the stop, the dog, and what was going on. (Tr. 1, 41:18-20, 42:6-10; Tr. 1, 43:24-25, 44:1-2). As Ofc. Campbell was answering the questions, the Defendant bent over to tie his shoe which gave the officer the impression that he was about to run. (Tr. 1, 44:6-8). The Defendant had not yet signed the citation, and in fact the citation was never signed. (Tr. 1, 44:3-4). Ofc. Campbell called for another officer. (Tr. 1, 44:9). By this time, the K-9 had alerted on the car. (Tr. 1, 44:10-11). Approximately two minutes passed between the time that the Defendant was brought over to the car and the K-9 alerted on the vehicle. (Tr. 1, 47:11-15).

The Defendant's contention that once the ticket was on the trunk and ready to be signed the stop was over and that the K-9 free air sniff should not have taken place at that time because it was an unlawful detention lacks merit. In his Motion, the Defendant relies on U.S. v Perkins, 348 F. 3d 965, 971-972 (11th Cir. 2003), for his position. In Perkins the officer testified that after he had issued the citation he acted upon a "hunch" that Perkins was lying to him and initiated a new investigation based upon that hunch. 348 F.3d at 971. The Perkins Court found that initiating a new investigation after the citation had been written and the purpose of the traffic stop had been completed was an unlawful detention. Id .

Based upon the testimony of Ofc. Campbell and Ofc. Thompson the Court does not find any delay in completing the traffic stop created by calling for a K-9 to perform a free air sniff of the Cadillac. Dusty and Ofc. Thompson were already at the location prior to the traffic citations being written. (Tr. 2, 25:1-2, 28:14-15). Ofc. Thompson was essentially performing backup duties watching the occupants of the vehicle for the safety of the officers on the scene.(Tr. 2, 32:2-15).

Although Ofc. Thompson was asked to have Dusty perform the free air sniff right after he arrived, he delayed a few minutes due to officer safety concerns. Ofc. Thompson's time frames and testimony were credible and supported by the video surveillance from his patrol car camera. (Tr. 2, 26:1-16) (Govt. Ex 5).

Furthermore, Ofc. Campbell testified that the traffic stop was delayed by the Defendant's own actions because he kept asking questions about the stop rather than sign the citations. (Tr. 1, 43:24-25, 44:1-2). As Ofc. Campbell testified that as he was answering the Defendant's questions, the Defendant bent over to tie his shoe which gave the officer the impression that he was about to run. (Tr. 1, 44:6-8). Ofc. Campbell called for another officer. (Tr. 1, 44:9). By this time, the K-9 had alerted on the car. (Tr. 1, 44:10-11). In fact, the Defendant never signed the citations because he ran away from the scene after the K-9 alerted to the vehicle. (Tr. 1, 44:3-4).

In instances where the Defendant asks the officer questions, the delay becomes consensual. Once the encounter has become consensual, the officer may continue to detain the individual without violating the Fourth Amendment. Florida v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389 (1991). However, in this instance, the entire stop from the time Ofc. Campbell approached the vehicle and the time the K-9 alerted to the vehicle took only about twelve (12) to fifteen (15) minutes. The Eleventh Circuit has stated that a delay of up to fifty minutes is not considered unreasonable. U.S. v Hardy, 855 F.2d 753, 761 (11th Cir. 1988). Given the shortness of the time frame, the fact that the traffic stop did not end because the Defendant kept asking about the stop, and the fact that Ofc. Thompson and Dusty were already at the scene, there was not an unreasonable delay in the traffic stop. Thus, it is respectfully recommended that there was no undue detention and violation of the Defendant's constitutional rights.

### (3) Whether there was Probable Cause to Search the Vehicle

The Defendant argues that the Government must establish that the K-9 alert in this case rises to the level of probable cause to search the vehicle. The Defendant argues that Dusty's inaccuracy rate makes him unreliable and prevents his alert in this instance from establishing probable cause for the search. The Government counters that sufficient training in and of itself provides sufficient proof of the dogs accuracy.

It is not disputed that the alert of a drug detection dog to a person's property can supply not only reasonable suspicion but probable cause to search property. Hearn v Board of Public Education, 191 F. 3d 1329, 1333 (11th Cir. 1999) *cert. denied.* 529 U.S. 1109 (2000). Although the Eleventh Circuit has not extensively addressed the issue of a drug detection canine's reliability, the Court has found that training alone is sufficient proof of a dog's reliability. U.S. v Banks, 3 F.3d 399, 402 (11th Cir. 1993) (holding that probable cause arises when a drug-trained canine alerts to the presence of a narcotic); U.S. v. Sentovich, 677 F.2d 834, 837 n. 8 (11th Cir. 1982) (stating in dicta that the Eleventh Circuit follows the holdings of other circuits that training alone is sufficient proof of a canine's reliability)).

In the United States v. Diaz, the Sixth Circuit set forth guidelines as the quality and quantity of evidence necessary to establish the reliability of a drug detection canine as follows:

> [w]hen evidence is presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the credibility of the dog. Lack of additional evidence, such as documentation of the exact course of training, similarly would affect the dog's reliability. As with the admissibility of evidence generally, the

> admissibility of evidence regarding a dog's training and reliability is
> committed to the trial court's sound discretion.

25 F. 3d 392, 394 (6th Cir. 1994) (internal quotations omitted). In this case, the Government presented the training records of Dusty, and the testimony of Ofc. Thompson, Dusty's handler. (Govt. Ex. # 6). Ofc. Thompson testified that in 2005, he and Dusty went through a 450 hour course in patrol usage, meaning obedience, apprehension work, tracking, building searches, and area searches. Upon completion of the training they certified in patrol through the National Police Canine Association. (Tr. 2, 18-24). In July of 2005 he and Dusty trained for approximately 200 hours in narcotics detection in different environments - vehicles, buildings, and large areas. (Tr. 2, 7:7-14). As a result of the training, they certified with the National Police Canine Association in narcotic detection in both vehicles and buildings for the detection of marijuana, cocaine, crack, base, HCL, methamphetamine, heroin, and MDMA or ecstacy. (Tr. 2, 7:14-17). He and Dusty have been certified every year since 2005. (Tr. 2, 14:15-17). In addition to the certification, FMPD poicy and procedures dictate that K-9 officers attend weekly training for anywhere between six and ten hours. (Tr. 2, 15:7-9). The testimony of Ofc. Thompson and Dusty's training records, combine to show that Dusty was reliable, under the Eleventh Circuit's standards on the date of the traffic stop in question.

The Defendant's conclusion that there was insufficient reliability on the part of this dog to constitute probable cause to search the Defendant's vehicle is without merit. Probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). Dusty's training, certifications and actual field work, Ofc. Thompson's training and certifications and actual field work is sufficient to establish the reliability necessary to find the required probability that

contraband was in the vehicle under the Eleventh Circuit's case law. Thus, the Court respectfully recommends that the traffic stop, subsequent dog sniff, and search of the Defendant's vehicle did not violate the Defendant's Fourth Amendment rights.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant's Motion to Suppress Evidence and Memorandum of Law (Doc. #18) is **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this __16th__ day of December, 2009.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record